UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

DELAWARE TRUST COMPANY, *as TCEH First*
*Lien Indenture Trustee,*

                                        Plaintiff,

                    -v-

WILMINGTON TRUST, N.A., *as First Lien*
*Collateral Agent and First Lien Administrative Agent,*

                                        Defendant.

------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/23/2015

15 Civ. 2883 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

The motions pending in this case together present the question of whether a federal

bankruptcy court in Delaware, or a New York state court, should resolve a dispute as to how to

allocate a debtor-in-bankruptcy's monthly cash collateral payments among its creditors.

On April 29, 2014, Texas Competitive Electric Holdings Company LLC ("TCEH") and

several affiliates filed voluntary petitions for reorganization in the United States Bankruptcy

Court for the District of Delaware (the "Bankruptcy Court"). On June 5, 2014, the Bankruptcy

Court heard argument as to how to allocate, among various of TCEH's creditors, monthly cash

collateral and adequate protection payments. The Bankruptcy Court determined that there was

no need, at that time, to resolve the allocation dispute. It left open whether that dispute would

ultimately be resolved by it or another court.

The latter issue, relating to the forum in which that dispute is to be resolved, now comes

before this Court. In March 2015, plaintiff Delaware Trust Company ("Delaware Trust") filed,

in New York State Supreme Court, a contract action to resolve the allocation dispute. Defendant

Wilmington Trust, N.A. ("Wilmington Trust") removed that case to this Court.  Wilmington Trust and three proposed intervenors now ask this Court to transfer this matter to the Bankruptcy Court, arguing that this dispute is entwined with the ongoing bankruptcy proceeding.  By contrast, Delaware Trust asks the Court to remand the case to New York state court, arguing that the allocation dispute lacks the required nexus to the pending bankruptcy proceedings so as to give federal courts jurisdiction over it, and alternatively that the Court should abstain from hearing it.

Resolution of these motions turns largely on whether the dispute over allocation of cash collateral payments among creditors is a "core" proceeding within TCEH's bankruptcy, *i.e.*, one that either "arises under" or "arises in" that bankruptcy proceeding.  For the reasons that follow, the Court holds that this dispute "arises in" the TCEH bankruptcy proceeding and thus is a core bankruptcy proceeding, supplying federal jurisdiction; that the federal courts ought not abstain from hearing it; and that the case is properly heard, within the federal system, by the Bankruptcy Court.  The Court accordingly denies Delaware Trust's remand motion and grants Wilmington Trust's transfer motion.  The Court also grants the proposed intervenors' motions to intervene.

# I.      Factual Background[1]

## A.      Bankruptcy Filing

On April 29, 2014 (the "Petition Date"), TCEH and several affiliates (collectively, "the Debtors") filed voluntary petitions for reorganization pursuant to 11 U.S.C. § 101 *et seq.*, in the Bankruptcy Court (the "Chapter 11 Cases").  The Chapter 11 Cases are being jointly

---

[1] The Court's account of the facts derives from Delaware Trust's Complaint, Dkt. 1, Ex. A ("Compl."), and the parties' submissions on the instant motions.

administered as *In re Energy Future Holdings Corp., et al.*, No. 14 Bk. 10979 (CSS) (Bankr. D. Del.).

As of the Petition Date, the Debtors represented that they had more than $25 billion of first lien debt, falling into three categories: (1) $22.6 billion of debt outstanding under a credit agreement (the "Bank Debt"; the Court refers to holders of such debt as the "Lenders"); (2) $1.75 billion of debt outstanding under a first lien indenture (the "First Lien Notes"; the Court refers to holders of such notes as the "First Lien Noteholders"); and (3) $1.255 billion of debt outstanding under first lien interest rate swap and commodity hedge agreements (the "Swap Agreements"; the Court refers to holders of such agreements as "the Secured Swap Providers"). *See* Dkt. 41, Declaration of Ellen M. Halstead ("Halstead Decl."), Ex. D at 30–31, 93 n.61.

### B.       The Creditor Parties and the Intercreditor Agreement

Delaware Trust is the indenture trustee for the First Lien Noteholders who hold the $1.75 billion of First Lien Notes.  Compl. ¶ 2.  The First Lien Notes were issued in 2009 by TCEH and TCEH Finance, Inc.  Dkt. 1, ¶ 9.

Wilmington Trust is the First Lien Administrative Agent and First Lien Collateral Agent for the $22.6 billion of First Lien Bank Debt.  *Id.* ¶ 4.  In 2007, the Debtors issued the First Lien Bank Debt as part of a leveraged buy-out of TCEH's ultimate parent company, Energy Future Holdings Corporation.  *See id.* ¶ 8.  One proposed intervenor, Titan Investment Holdings LP ("Titan"), holds about $50 million of First Lien Bank Debt.  Dkt. 67.  The First Lien Notes are secured by liens that are equal in priority to the liens securing the First Lien Bank Debt and the First Lien Swaps.  *See* Dkt. 1, ¶ 9; Compl. ¶ 21.  The First Lien Notes are also equal in priority of payment with the First Lien Bank Debt and the First Lien Swaps.  *See* Dkt. 1, ¶ 9; Compl. ¶ 21.

As noted, besides the First Lien Notes and the First Lien Bank Debt, there are also First Lien Swaps, pursuant to which the Debtors have $1.255 billion of debt.  Most of the swap debt is held by two proposed intervenors: (1) Morgan Stanley Capital Group ("MSCG"), whose secured claims total more than $225 million, *see* Halstead Decl., Ex. E at 5; and (2) J. Aron & Co. ("J. Aron"), whose secured claims total more than $950 million, *see id.*, Ex. F at 6.

An Intercreditor Agreement governs the relative rights and priorities of the First Lien Notes, the First Lien Bank Debt, and the First Lien Swaps.  Compl. ¶ 21.  The Intercreditor Agreement requires equal priority of payment in respect of "Secured Obligations" then due and payable, with some exceptions.  It provides that all First Lien Creditors have equal priority with respect to the collateral securing the First Lien Debt.  *Id*. ¶¶ 21–24.  It also contains a permissive, non-exclusive forum-selection clause consenting to jurisdiction in New York.  *See* Dkt. 60, Declaration of Jonathan Rosenberg ("Rosenberg Decl."), Ex. A, § 9.6.  It further provides that Wilmington Trust shall distribute collateral in accordance with a specific waterfall based on all then-outstanding secured obligations.  *Id.* § 4.1.  Finally, the Intercreditor Agreement contemplates the possibility that the Debtors would file for bankruptcy.  *Id.* § 1.1.

### C.    TCEH's Bankruptcy Proceedings and the Cash Collateral Order

On April 29, 2014, the Debtors initiated bankruptcy proceedings in the Bankruptcy Court.  Compl. ¶ 30.  To obtain the required consent to the continued use of cash collateral during the bankruptcy proceedings, the Debtors agreed to make monthly payments to Wilmington Trust (in its capacity as First Lien Administrative Agent), to Delaware Trust (in its capacity as Indenture Trustee), and directly to the Secured Swap Providers to protect all First Lien Creditors against any diminution in value of the collateral securing the First Lien Debt.  *See id.*

A dispute arose, however, as to the calculation of these monthly payments under the Intercreditor Agreement.  Under the order as initially drafted, monthly payments were to be calculated by using the principal amount of debt owed to first lien creditors as of April 29, 2014, and a rate of LIBOR plus 450 basis points (the "Petition Date Allocation Method").  However, a First Lien Noteholder, Aurelius Capital Management, LP ("Aurelius"), argued that the Intercreditor Agreement requires a different methodology (the "Postpetition Allocation Method").  Under it, monthly payments among the creditors would be apportioned based on the outstanding amount (including accrued but unpaid interest) on each debt instrument as of each payment date.  Because the creditors have varying interest rates, the use of this methodology would tend to benefit First Lien Noteholders like Aurelius, whose notes have a higher interest rate—11.5%.  Several First Lien Bank Debt Holders opposed Aurelius's bid.  They urged the Bankruptcy Court to adopt the Petition Date Allocation Method.  *See* Rosenberg Decl., Ex. H at 31–39.

The Bankruptcy Court received briefs and heard argument on the allocation dispute.  *See, e.g.*, *id.*  During argument, Aurelius asserted that the allocation dispute was "an issue that's going to flow through this case" and is a "precursor to how distributions might be made under a plan." *Id.* Ex. I at 232.  The hearing, however, took place at the end of a lengthy day of proceedings at which a host of bankruptcy matters were addressed.  *See id.* at 206, 232.  Bankruptcy Judge Sontchi thereupon told the parties he was not prepared, at that point, to resolve the monthly payments allocation issue, given the lateness of the hour and that issuance of a Cash Collateral Order was urgent for the Debtors.  *See id.* at 225–26.  Instead, as a temporary measure, he ordered that the difference between the amounts due under the Petition Date and the Postpetition Allocation Methods be placed in escrow pending a further order of the Bankruptcy Court or

another court of competent jurisdiction.  *Id.* at 232–33.  In the Cash Collateral Order, *see id.*
Ex. B, the parties reserved their rights to make all arguments regarding allocation of plan
distributions.

      Significant here, Judge Sontchi emphasized that he was *not* deciding the proper venue of
this dispute, nor whether he had jurisdiction to resolve it—rather, he stated, he was simply not
ruling on those matters at that time.  *See id.* Ex. I at 232 ("[I]t may be at some point it would be
appropriate for me to get involved in this.  And it may be I get involved in what is being set aside
to be decided by a Court of competent jurisdiction.  I'm not saying I won't do that. . . .  But I
can't deal with it in this context."); *see also id*. at 224–25 ("You can fight here maybe, you can
fight somewhere else maybe.").

      As to the mechanics of the escrow fund, on July 31, 2014, TCEH and Bank of New York
Mellon ("BNY Mellon") entered into an Escrow Agreement governing the deposit and
distribution of the escrowed funds.  *See* Rosenberg Decl., Ex. J.  Under that agreement, to which
the First Lien Notes Trustee is a notice party, BNY Mellon holds the escrowed funds until a
further order of the Bankruptcy Court (or another court of competent jurisdiction) regarding the
distribution of these funds.  *Id.* at ¶ 2.  At argument in this Court, counsel represented that the
account (as of mid-May 2015) held less than $3 million, although it continues to accumulate and
is expected to grow substantially.  Dkt. 68 ("Tr."), 11, 60.

      On April 14, 2015, the Debtors filed a proposed plan of reorganization, which includes a
"tax-free spin-off" of TCEH that would result in the First Lien Creditors owning, *pro rata*, the
equity in a newly formed entity that will own TCEH's assets.  Rosenberg Decl., Ex. D; *see also*
Dkt. 56, Declaration of Zoe E. Shea ("Shea Decl."), Ex. B.  At a May 4, 2015 hearing, the
Bankruptcy Court set aside 20 trial days, starting on November 18, 2015 and concluding by

December 23, 2015, to consider confirmation of the proposed plan of reorganization.  Rosenberg
Decl., Ex. D at 104; *see also id.* at 105–06; *id.* at 112.

> ### D.       This Litigation and Its Procedural History

On March 13, 2015, Delaware Trust filed a Complaint in the Supreme Court of New
York in Manhattan.  It sought (i) a declaratory judgment that the escrowed funds be allocated for
the benefit of the First Lien Notes, and (ii) specific performance directing the escrow agent to
turn over the escrowed funds to Delaware Trust for the benefit of First Lien Noteholders.
Compl. ¶¶ 43, 47.  Delaware Trust thereby seeks to resolve the issue on which Judge Sontchi
reserved judgment: the allocation of monthly cash collateral payments.  Delaware Trust's
proposed resolution, under which the Postpetition Allocation Method would be used to apportion
such payments among the First Lien Creditors, would favor those debt instruments with higher
postpetition interest rates (for example, the First Lien Notes at 11.5%).

On April 13, 2015, Delaware Trust voluntarily dismissed BNY Mellon, whom it had
named as a defendant, without prejudice.  *See* Dkt. 9.

On April 14, 2015, Wilmington Trust, in its capacity as First Lien Administrative Agent,
removed this action to this Court.  Dkt. 1.  Before the removal, the proposed intervenors here—
Titan, MSCG, and J. Aron—had each moved to intervene in state court.  Dkt. 9; Dkt. 12.  Those
motions were pending as of the time of removal.  Dkt. 9; Dkt. 12.

On April 20, 2015, this Court held an initial conference and set a briefing schedule for the
proposed intervenors' motions for intervention, Delaware Trust's anticipated motion for remand
(including based on a claim of mandatory abstention), and Wilmington Trust's anticipated
motion to transfer the case to the Bankruptcy Court.  *See* Dkt. 26; Dkt. 63.

As to the issue of intervention: (1) on April 24, 2015, Titan moved to intervene, Dkt. 31, and filed a memorandum of law and two declarations in support, Dkt. 34, 37, 38; (2) on April 27, 2015, MSCG and J. Aron jointly moved to intervene, Dkt. 39, and filed a memorandum of law and two declarations in support, Dkt. 40–42; (3) on May 1, 2015, Delaware Trust filed a memorandum of law in opposition, Dkt. 46, and (4) on May 6, 2015, Titan filed a reply brief in further support, Dkt. 53, as did MSCG and J. Aron, Dkt. 62.

As to the issues of remand and transfer:  (1) on April 28, 2015, Delaware Trust filed a motion to remand the case to state court, Dkt. 43, and a declaration and memorandum of law in support, Dkt. 44–45; (2) on May 6, 2015, Wilmington Trust filed a motion to transfer the case to the District of Delaware, Dkt. 61, and a declaration and a memorandum of law in support, Dkt. 58, 60; (3) the same day, all three proposed intervenors filed a joint motion to transfer the case to the District of Delaware, Dkt. 55, and two declarations and a memorandum of law in support, Dkt. 56, 57, 59, which also opposed Delaware Trust's remand motion, and (4) on May 11, 2015, Delaware Trust filed a reply brief, Dkt. 65, as well as a declaration in further support of remand and opposing transfer, Dkt. 66.  On May 13, 2015, the Court held argument.  *See* Dkt. 68 ("Tr").

## II.      Motions to Intervene

### A.      Legal Standards

Federal Rule of Civil Procedure 24(a)(2) provides that "[o]n timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."  The Second Circuit has set out a four-part test, each part of which must be satisfied for a party to intervene as of right:

> In order to be entitled to intervene as of right under Rule 24(a)(2), "an intervenor must show that: (1) the application is timely; (2) the applicant claims an interest relating to the property or transaction which is the subject matter of the action; (3) the protection of the interest may as a practical matter be impaired by the disposition of the action; and (4) the interest is not adequately protected by an existing party."

*St. John's Univ., N.Y. v. Bolton*, 450 F. App'x 81, 83 (2d Cir. 2011) (summary order) (quoting *Restor-A-Dent Dental Labs., Inc. v. Certified Alloy Prods., Inc.*, 725 F.2d 871, 874 (2d Cir. 1984)).  In applying this test, the Court is to be mindful that Rule 24 "provides the flexibility necessary 'to cover the multitude of possible intervention situations' . . . [and that] common sense demands that consideration . . . be given to matters that shape a particular action or particular type of action."  *United States v. Hooker Chems. & Plastics Corp.*, 749 F.2d 968, 983 (2d Cir. 1984) (quoting *Restor-A-Dent Dental Labs.*, 725 F.2d at 875).

As to the first requirement, timeliness, courts consider the case chronology as well as "(1) how long the applicant had notice of the interest before it made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances militating for or against a finding of timeliness."  *United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 70 (2d Cir. 1994).

As to the second requirement, interest, a party is entitled to intervene when it "claims an interest relating to the property or transaction which is the subject matter of the action."  *Jakubik v. Schmirer*, No. 13 Civ. 4087 (PAE), 2013 WL 3465857, at *1 (S.D.N.Y. July 9, 2013) (quoting *Bolton*, 450 F. App'x at 83).  This interest "must be 'direct, substantial, and legally protectable.'"  *Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 129 (2d Cir. 2001) (quoting *Wash. Elec. Coop., Inc. v. Mass. Mun. Wholesale Elec. Co.*, 922 F.2d 92, 97 (2d Cir. 1990)).

As to the third requirement, impairment, the proposed intervenor must show that his interest may be impaired by the disposition of the action, *see id.*, which can be satisfied by

asserting that "as a practical matter," an adverse decision may "compromise[]" the party's claims, *Hartford Fire Ins. Co. v. Mitlof*, 193 F.R.D. 154, 161–62 (S.D.N.Y. 2000) (citing *N.Y. Pub. Interest Research Grp., Inc. v. Regents of the Univ. of N.Y.*, 516 F.2d 350 (2d Cir. 1975)).

As to the final requirement, adequacy, a proposed intervenor's interests cannot be "identical" to those of other parties, and cannot be adequately represented by another party. *See, e.g.*, *Jakubik*, 2013 WL 3465857, at *1. This burden, however, "should be treated as minimal." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972).

Rule 24 also provides for permissive intervention: "On timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1). In exercising its discretion, the court must consider whether intervention "will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). Additional relevant factors include "'[1] the nature and extent of the intervenors' interests,' [2] the degree to which those interests are 'adequately represented by other parties,' and [3] 'whether parties seeking intervention will significantly contribute to [the] full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented.'" *Diversified Grp., Inc. v. Daugerdas*, 217 F.R.D. 152, 157 (S.D.N.Y. 2003) (quoting *H.L. Hayden Co. of N.Y. v. Siemens Med. Sys., Inc.*, 797 F.2d 85, 89 (2d Cir. 1986)). This rule is "to be liberally construed" in favor of intervention. *Degrafinreid v. Ricks*, 417 F. Supp. 2d 403, 407 (S.D.N.Y. 2006).

Courts have found permissive intervention justified where a party "assert[s] an interest in a portion of the escrow fund at issue," because "common questions of law and fact exist that warrant joint adjudication." *Tide Nat'l Gas Storage I, L.P. v. Falcon Gas Storage Co.*, No. 10 Civ. 5821 (KMW) (THK), 2012 U.S. Dist. LEXIS 188864, at *5 (S.D.N.Y. Aug. 7, 2012).

### B.      Application

Proposed intervenors MSCG and J. Aron easily satisfy the requirements for intervention as of right.  Their motion to intervene was timely—they so moved almost immediately, and their intervention has neither delayed this proceeding nor prejudiced any party.  They have significant interests at stake, and stand to be harmed if Delaware Trust prevails and the Postpetition Allocation Method is chosen:  The interest rate on their debt instruments is lower than that applicable to the First Lien Noteholders whom Delaware Trust represents, such that choice of that methodology would disfavor them.  Finally, no other party represents the swap holders or can adequately advocate their position.  Perhaps for this reason, Delaware Trust has not opposed this intervention motion on the merits.  *See* Dkt. 46, at 8 (conceding that it "does not object to the Secured Swap Providers intervening in this case before this Court").  The Court therefore grants the joint motion of MSCG and J. Aron to intervene.

As to Titan's motion to intervene, the Court holds that, at a minimum, Titan may intervene permissively.  Its motion was timely and caused neither delay nor prejudice.  Its interests, as a holder of some $50 million in bank debt, are substantial, and, as with MSCG and J. Aron, stand to be impaired if the Postpetition Allocation Method were chosen.  The Court cannot assess at this time whether Titan's interests will be adequately represented by Wilmington Trust, but it is clear from Titan's submissions that its participation will helpfully contribute to the Court's understanding and just resolution of the issues in play.  Courts have similarly found permissive intervention justified where a party "assert[s] an interest in a portion of the escrow fund at issue," because "common questions of law and fact exist that warrant joint adjudication."  *Tide Nat'l Gas Storage*, 2012 U.S. Dist. LEXIS 188864, at *5.  Titan's motion to intervene is therefore granted.

### III.     Motions to Remand and Transfer

A "federal court has leeway 'to choose among threshold grounds for denying audience to a case on the merits.'" *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999)).  Here, Delaware Trust's motion to remand and Wilmington Trust's motion to transfer are, in large measure, two sides of the same coin.  In brief, if this dispute arises under, or arises in, TCEH's ongoing bankruptcy proceeding, it must be transferred to the Delaware Bankruptcy Court, which is overseeing that ongoing—and swiftly progressing—proceeding.  If, however, this dispute does not arise under or in that bankruptcy proceeding, but merely relates to it, then abstention in favor of state-court resolution may be warranted, provided that the state court can timely resolve the dispute.  Finally, if this dispute does not have any nexus to a bankruptcy proceeding, then federal jurisdiction is lacking and this case must be remanded to state court.

The Court first addresses the remand motion, and then analyzes the transfer motion.  *See Lothian Cassidy, LLC v. Lothian Exploration & Dev. II, L.P.*, 487 B.R. 158, 161 (S.D.N.Y. 2013) (addressing remand motion first, and then transfer motion); *Stahl v. Stahl*, No. 03 Civ. 0405 (VM), 2003 WL 22595288, at *2 (S.D.N.Y. Nov. 7, 2003) (same).

#### A.     The Motion to Remand

##### 1.     Applicable Legal Standards

Under 28 U.S.C. § 1452(a), "[a] party may remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title."  The party that seeks to remove the case to federal court bears the burden of establishing that the federal district court has jurisdiction.  *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189

(1936); *Linardos v. Fortuna*, 157 F.3d 945, 947 (2d Cir. 1998). "[O]ut of respect for the limited jurisdiction of the federal courts and the rights of states, [courts] must 'resolv[e] any doubts against removability.'" *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 488 F.3d 112, 124 (2d Cir. 2007) (quoting *Somlyo v. J. Lu-Rob Enters., Inc.*, 932 F.2d 1043, 1045–46 (2d Cir. 1991)); *accord Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208, 220 (2d Cir. 2013).

Under 28 U.S.C. § 1334(b), district courts—and thus bankruptcy courts—have jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." *See generally Stern v. Marshall*, 131 S. Ct. 2594, 2603 (2011); *see also Baker v. Simpson*, 613 F.3d 346, 350–51 (2d Cir. 2010). The three types of jurisdiction that such courts may exercise under § 1334 are "colloquially referred to as 'arising under,' 'arising in,' and 'related to' jurisdiction." *Lothian Cassidy*, 487 B.R. at 161 (quoting *In re Ames Dep't Stores, Inc.*, 317 B.R. 260, 269 (Bankr. S.D.N.Y. 2004)). Thus, the threshold question for this Court is whether jurisdiction exists on any of these three grounds here. These grounds are defined as follows:

"*Arising under*" jurisdiction: "Arising under" proceedings consist of causes of action created by Title 11 of the Bankruptcy Code, meaning "'any matter under which a claim is made under a provision of [T]itle 11.'" *Id.* (quoting *In re Salander-O'Reilly Galleries, LLC*, 475 B.R. 9, 27 (S.D.N.Y. 2012)).

"*Arising in*" jurisdiction: Although the precise definition of a proceeding "arising in" Title 11 is "not entirely clear," the Second Circuit has held that "it covers claims that 'are not based on any right expressly created by [T]itle 11, but nevertheless, would have no existence outside of the bankruptcy.'" *Baker*, 613 F.3d at 350–51 (quoting *In re Wood*, 825 F.2d 90, 97 (5th Cir. 1987)). A claim arises in a bankruptcy proceeding if it "would have no practical

existence *but for* the bankruptcy."  *Id.* at 351 (quoting *Grausz v. Englander*, 321 F.3d 467, 471 (4th Cir. 2003)).

"*Related to*" jurisdiction:  Finally, a civil action is "related to" a Title 11 case if the action's "outcome might have any 'conceivable effect' on the bankrupt estate."  *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir. 2011) (quoting *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir. 1992)).  Thus, an "action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate."  *In re New 118th LLC*, 396 B.R. 885, 890 (Bankr. S.D.N.Y. 2008) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)).

In cases where multiple of these bases for jurisdiction are said to exist, it is important to isolate which in fact exist, because if only the third—"related to"—exists, a federal court may be required to abstain from hearing the case, in deference to state tribunals.  As the Second Circuit has explained, a proceeding that "arises under" or "arises in" Title 11 is a "core" bankruptcy proceeding, but a proceeding that is merely "related to" a Title 11 case is not—and in a non-core proceeding, the doctrine of mandatory abstention applies.  *See Baker*, 613 F.3d at 350 (citing 28 U.S.C. § 1334(c)(2)).  Under that doctrine, a federal court must abstain from hearing an action if, *inter alia*, it can be "timely adjudicated" in a proper state forum.  28 U.S.C. § 1334(c)(2).

A court asked to abstain on this ground must be mindful, on the one hand, that Congress "inten[ded] to define 'core' bankruptcy proceedings expansively," *Baker*, 613 F.3d at 351 (citing *In re CBI Holding Co.*, 529 F.3d 432, 460–61 (2d Cir. 2008)), and that "core" proceedings are to be given "broad interpretation that is close to or congruent with constitutional limits," *In re U.S. Lines, Inc.*, 197 F.3d 631, 637 (2d Cir. 1999) (quoting *In re Best Prods. Co.*, 68 F.3d 26, 31 (2d

Cir. 1995); *accord In re S.G. Phillips Constructors, Inc.*, 45 F.3d 702, 705 (2d Cir. 1995), and on

the other, that mere efficiency cannot justify an unlawful exercise of authority, *see, e.g.*, *Stern*,

131 S. Ct. at 2619.  Where (as here) a case has been removed from state court and a party (like

Delaware Trust here) urges mandatory absention, six criteria must be met to support such

abstention: (1) a "timely" motion for abstention must have been brought; (2) the action must be

based upon a state law claim; (3) the action must be "related to" a bankruptcy proceeding, as

opposed to "arising under" the Bankruptcy Code or "arising in" a case under the Bankruptcy

Code; (4) the sole federal jurisdictional basis for the action must be Section 1334; (5) the action

must have been "commenced" in state court; and (6) the action must be capable of being "timely

adjudicated" in state court.  *Trs. of Masonic Hall & Asylum Fund v. Pricewaterhousecoopers*

*LLP*, No. 08 Civ. 10494 (GEL), 2009 WL 290543, at *4 (S.D.N.Y. Feb. 6, 2009); *In re*

*WorldCom, Inc. Sec. Litig.*, 293 B.R. 308, 331 (S.D.N.Y. 2003); *see generally Mt. McKinley Ins.*

*Co. v. Corning Inc.*, 399 F.3d 436, 446 (2d Cir. 2005).

A final potentially relevant doctrine is that of permissive abstention, based on 28 U.S.C.

§ 1334(c)(1).  It provides that, where federal jurisdiction exists, "nothing in this section prevents

a district court in the interest of justice, or in the interest of comity with State courts or respect

for State law, from abstaining from hearing a particular proceeding arising under title 11 or

arising in or related to a case under title 11."  28 U.S.C. § 1334(c)(1).  In deciding whether to

abstain on this ground, courts weigh considerations of comity and federalism, judicial economy,

and efficiency, including:

> (1) the effect or lack thereof on the efficient administration of the estate if a Court
> recommends abstention, (2) the extent to which state law issues predominate over
> bankruptcy issues, (3) the difficulty or unsettled nature of the applicable state law,
> (4) the presence of a related proceeding commenced in state court or other
> nonbankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C.
> § 1334, (6) the degree of relatedness or remoteness of the proceeding to the main

bankruptcy case, (7) the substance rather than form of an asserted 'core' proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court, (9) the burden on the court's docket, (10) the likelihood that the commencement of the proceeding in a bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to a jury trial, and (12) the presence in the proceeding of nondebtor parties.

*Lothian Cassidy*, 487 B.R. at 165 (citations omitted).  A court should proceed carefully before permissively abstaining, however, because federal courts have a "'virtually unflagging obligation . . . to exercise the jurisdiction given them,' and may abstain only for a few 'extraordinary and narrow exception[s].'"  *In re WorldCom*, 293 B.R. at 332 (quoting *Colo. River Water Conserv. Dist. v. United States*, 424 U.S. 800, 817 (1976)).

### 2.    Application

The requirements for "relating to" jurisdiction are clearly met in this case because resolution of the allocation dispute certainly could have, at a minimum, a "conceivable effect" on TCEH's bankruptcy estate.  Among other things, the present dispute will directly affect the allocation of money currently in TCEH's coffers—*i.e.*, the distribution of the debtor's current property—because plaintiff Delaware Trust seeks a declaration, and specific performance, that all past *and future* monthly adequate protection payments be allocated based on the Postpetition Allocation Method.  *See* Compl. ¶ 43; *see also infra*, pp. 20–21.  In addition, TCEH's proposed plan of reorganization itself uses the Petition Date Allocation Method rather than the Postpetition Allocation Method, *see* Rosenberg Decl., Ex. D; *see also* Shea Decl., Ex. B, which reflects the extent to which the choice of allocation here is intertwined with, and may well affect, broader confirmation issues in this bankruptcy.  *See generally In re WorldCom*, 293 B.R. at 317 ("[A]n action has a 'conceivable effect' if 'the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts

upon the handling and administration of the bankrupt estate.'") (quoting *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.6 (1995)); *see also infra*, pp. 21–24.

Federal jurisdiction therefore exists here.  However, the determination that "related to" jurisdiction alone exists here would not resolve the key issue that divides the parties: whether the allocation dispute is to be resolved in a federal or state forum.  That is because Delaware Trust vigorously argues that if the only basis for federal jurisdiction is "related to" jurisdiction, the Court must abstain in favor of the New York state courts, which, it argues, can promptly resolve this dispute by applying familiar principles of state contract law to the Intercreditor Agreement.  The Court therefore must resolve whether "arising under" or "arising in" jurisdiction exists (in which case this is a core proceeding and the doctrine of mandatory jurisdiction does not apply).

For several independent reasons, the Court holds that this dispute "arises in" Title 11.  As a result, this is a core proceeding, and mandatory abstention does not apply.

*First*, reviewing the history of this dispute, it is clear that it "would have no practical existence *but for*" the bankruptcy proceedings, *Baker*, 613 F.3d at 351 (citation omitted), as the need to afford adequate protection for creditors with respect to their interests in cash collateral flows directly from the Bankruptcy Code, which in turn was triggered by TCEH's bankruptcy filing.

By way of explanation, the filing of a Chapter 11 bankruptcy petition creates an estate consisting of virtually all of the debtor's property at the time of filing.  11 U.S.C. § 541(a).  The debtor's property includes "cash collateral," which the Bankruptcy Code defines as cash, securities, deposit accounts, and cash equivalents.  *Id.* at § 363(a).  Often—as in this case— creditors hold security interests in cash collateral.  The Bankruptcy Code prohibits the debtor from spending such cash collateral without the consent of all secured creditors, or a court order.

17

*Id.* at § 363(c)(2).  In order to obtain such consent from creditors, debtors often need to make adequate protection payments.  *Id.* at § 361.  These payments protect creditors from the diminution of their interests.  *See, e.g.*, *id.* at § 363(e); *see also In re WestPoint Stevens, Inc.*, 600 F.3d 231, 260 (2d Cir. 2010) ("In bankruptcy proceedings, a secured creditor ordinarily has a statutory right to adequate protection payments to protect its interests against the diminution in value of its security."); *Bluebird Partners, L.P. v. First Fid. Bank, N.A. N.J.*, 85 F.3d 970, 972 (2d Cir. 1996) ("Generally, the right to adequate protection allows a secured creditor or its representative to propose a method of protecting its interest against the diminution in value of the security during a bankruptcy proceeding.").  If creditors are not afforded adequate protection, they can and may enforce their security interests against the debtor.  A debtor who has filed for bankruptcy thus will often have a strong interest in securing the creditors' approval for spending cash collateral while the petition for reorganization remains pending.  This in turn may entail paying periodic cash payments to such creditors.

That is what happened in this case.  However, complicating matters, TCEH's creditors dispute among themselves the methodology for prioritizing their respective interests in such collateral because, it appears, the Intercreditor Agreement is less than optimally clear as to which allocation methodology would apply upon a bankruptcy filing: the Petition Date or the Postpetition Allocation Method.  Given this dispute's origins and nature, it could *only* have arisen during, and in connection with, ongoing bankruptcy proceedings.

Indeed, tellingly, the parties had been signatories to the Intercreditor Agreement since 2007, but no such dispute emerged *until* TCEH's bankruptcy filing.  *In re Ben Cooper, Inc.*, 896 F.2d 1394, 1400 (2d Cir. 1990) ("We hold that the timing of a dispute may render it uniquely a bankruptcy case."), *vacated sub nom. Ins. Co. of State of Pa. v. Ben Cooper, Inc.*, 498 U.S. 964

(1990), *and opinion reinstated*, 924 F.2d 36 (2d Cir. 1991).  Such is unsurprising, as the concept

of adequate protection derives from the Bankruptcy Code.  *See* 11 U.S.C. § 362(d)(1); *In re*

*Markos Gurnee P'ship*, 252 B.R. 712, 713 (Bankr. N.D. Ill. 1997), *aff'd sub nom. First Midwest*

*Bank v. Steege*, No. 97 Civ. 3571 (CRN), 1998 WL 295507 (N.D. Ill. May 21, 1998) ("Adequate

protection is a concept created by the Bankruptcy Code (Title 11, U.S.C.), and hence the present

proceeding, which seeks to enforce an order for adequate protection could only take place in a

bankruptcy case.  Such proceedings 'arise in' cases under Title 11, and therefore are within the

jurisdiction of the district court pursuant to 28 U.S.C. § 1332(b).") (citing *In re Wolverine Radio*

*Co.*, 930 F.2d 1132, 1144–45 (6th Cir. 1991)).  Moreover, integral to the creditors' dispute itself

is the concept of a "petition date"—hence the choice between "Petition Date" and "Postpetition"

allocation methodologies.  The petition date pivot, of course, would not exist but for TCEH's

bankruptcy petition.

Claims like those here that by their nature can emerge only in a bankruptcy proceeding

are "arising in" claims under § 1334(b).  *See, e.g.*, *Baker*, 613 F.3d at 351 (legal malpractice

claim relating to representation during bankruptcy proceeding was within bankruptcy court's

"arising in" jurisdiction because it would have no practical existence but for the bankruptcy); *In*

*re Coudert Bros.*, No. 11 Civ. 4949 (PAE), 2011 WL 7678683, at *3 (S.D.N.Y. Nov. 23, 2011)

("[A] proceeding that involves rights created by bankruptcy law, or that could arise only in a

bankruptcy case, is a core proceeding.") (citation omitted); *New 118th LLC*, 396 B.R. at 890

("Generally, a core proceeding is one that invokes a substantive right under title 11, or could

only arise in the context of a bankruptcy case.") (citing *Binder v. Price Waterhouse Co., LLP*,

372 F.3d 154, 162–63 (3d Cir. 2004); *Wood*, 825 F.2d at 96–97).  And here, unlike in many other

cases where "arising in" jurisdiction is found, the bankruptcy statutes themselves explicitly give

rise to this controversy, as they treat matters pertaining to the use of cash collateral and adequate protection payments as core proceedings. *See, e.g.*, 28 U.S.C. §§ 157(b)(1) ("Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments . . . ."); 157(b)(2)(M) ("Core proceedings include, but are not limited to . . . orders approving the use or lease of property, including the use of cash collateral."); *Marshall v. Marshall*, 547 U.S. 293, 303 n.2 (2006).  In sum, because the present dispute could only have arisen in connection with a bankruptcy proceeding, it is a core proceeding. *Baker*, 613 F.3d at 351.

*Second*, the present dispute among creditors will affect the allocation of money currently in the Debtors' coffers, and the allocation of such money is itself a core bankruptcy function. *See* 28 U.S.C. § 157(b)(2)(A); *see also In re Orion Pictures Corp.*, 4 F.3d 1095, 1102 (2d Cir. 1993) ("[I]t is clear that Congress intended § 157(b)(2)(A)'s designation of matters relating to the administration of the estate as core to encompass a wide range of matters . . . .").  To be sure, money previously paid into escrow is outside the bankruptcy estate.  But Delaware Trust, the plaintiff, seeks a declaration, and specific performance, that all past *and future* monthly adequate protection payments be allocated based on the Postpetition Allocation Method.  Compl. ¶ 43 ("Plaintiff Delaware Trust requests a declaratory judgment that the Monthly Payments must be allocated among the First Lien Creditors using the Post-Petition Interest Allocation Calculation and, as a result, all Holdback Amounts with respect to *past and future* Monthly Payments must be allocated for the benefit of the First Lien Noteholders.") (emphasis added).  In other words, Delaware Trust wants all future adequate protection payments—funds currently in the Debtors'

coffers—to be allocated pursuant to its preferred method. *See* Tr. 33 ("THE COURT:  This is not a purely retrospective action--  [COUNSEL FOR PLAINTIFF]:  That's correct.").

In light of this request for relief, the present dispute unavoidably affects current property of the Debtors' estate. *See* 11 U.S.C. § 541(a).  And because it directly bears on the distribution of the Debtors' current property, this controversy "concern[s] the administration of the estate" by the Bankruptcy Court, which in turn is a core bankruptcy function under 28 U.S.C. § 157(b)(2)(A).  *See, e.g.*, *U.S. Lines, Inc.*, 197 F.3d at 637 ("Core bankruptcy functions . . . include . . . 'administer[ing] all property in the bankrupt's possession.'") (quoting *Straton v. New*, 283 U.S. 318, 321 (1931)).  Delaware Trust is myopic when it argues that the funds at issue in this dispute "are not property of any bankruptcy estate," Dkt. 44, at 1, as it ignores that the relief it seeks based on its reading of the Intercreditor Agreement is—and inherently must be— both retrospective *and* prospective in nature.

*Third*, although Delaware Trust characterizes this matter as merely a contract dispute, the case law makes clear that a contract dispute can be core to bankruptcy proceedings depending on its nature, and the nature of the dispute here makes it a core bankruptcy dispute.  In *In re U.S. Lines, Inc.*, *supra*, the Second Circuit explained that:

> whether a contract proceeding is core depends on (1) whether the contract is antecedent to the reorganization petition; and (2) the degree to which the proceeding is independent of the reorganization.  The latter inquiry hinges on "the nature of the proceeding."  *In re S.G. Phillips Constructors, Inc.*, 45 F.3d at 707. Proceedings can be core by virtue of their nature if either (1) the type of proceeding is unique to or uniquely affected by the bankruptcy proceedings, *see, e.g.*, *id.* at 706 (claim allowance), or (2) the proceedings directly affect a core bankruptcy function, *see, e.g.*, *In re Best Prods. Co.*, 68 F.3d at 31 (contractual subordination agreements affecting priority of claims).  Core bankruptcy functions of particular import to the instant proceedings include "[f]ixing the order of priority of creditor claims against a debtor," *id.*, "'plac[ing] the property of the bankrupt, wherever found, under the control of the court, for equal distribution among the creditors,'" *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 91 (2d Cir. 1988)

(quoting *Straton v. New*, 283 U.S. 318, 320–21 (1931)), and "administer[ing] all property in the bankrupt's possession," *Straton*, 283 U.S. at 321.

197 F.3d at 637.

Here, although the *contract* in the present case preceded the bankruptcy, the *dispute* did not. Far from being "independent" of the bankruptcy, this dispute emerged in the bankruptcy proceedings, would not exist absent those proceedings, and is intertwined with them. Indeed, notably, in the bankruptcy court, Aurelius—one of the First Lien Noteholders whom plaintiff Delaware Trust represents—advised the bankruptcy court that the monthly payment allocation dispute was "an issue that's going to flow through this case." Rosenberg Decl., Ex. I at 232. And Aurelius described the outcome of the allocation dispute as a "precursor to how distributions might be made under a plan" of reorganization. *Id.* Consistent with Aurelius's forecast, the Debtors have recently filed a proposed plan of reorganization that would use the *Petition Date* Allocation Method, rather than the Postpetition Allocation Method that plaintiff seeks here.[2] *See id.* Ex. D; *see also* Shea Decl., Ex. B; Tr. 61.

This Court, of course, cannot forecast the outcome of the pending bankruptcy. Just as it is possible that the allocation methodology on which the creditors part company will play a role in the ultimate reorganization plan, it is conceivable that it will not. But the cues available to the Court—including Aurelius's own statement about the importance and future ramifications of the dispute, made at a time when there was no bid to remove the allocation dispute from the Bankruptcy Court—are telling. They suggest that the resolution of this present allocation dispute

---

[2] Specifically, the Debtors' proposed plan of reorganization proposes a tax-free spin-off of TCEH that would result in the First Lien Creditors owning, *pro rata*, the equity in a newly formed entity that will own TCEH's assets. *See* Rosenberg Decl., Ex. D; *see also* Shea Decl., Ex. B. In other words, the Debtors' proposed plan of reorganization tracks the treatment of First Lien Creditors under the Petition Date Allocation Method, rather than adopting plaintiff's Postpetition-date-based construction of the Intercreditor Agreement.

will have sequellae in the bankruptcy proceedings.  And it is well-established that a dispute that "sets the table for a determination" regarding plan distributions qualifies as a core proceeding, satisfying "arising in" jurisdiction regardless of whether the dispute involves a prepetition contract.  *See, e.g.*, *In re Extended Stay, Inc.*, 435 B.R. 139, 146 (S.D.N.Y. 2010) (dispute over whether pre-bankruptcy negotiations violated prepetition contract was a core proceeding because it "clearly implicate[d] the core bankruptcy function of estate administration, particularly plan formation"); *In re DPH Holdings Corp.*, 437 B.R. 88, 96 (S.D.N.Y. 2010), *aff'd*, 448 F. App'x 134 (2d Cir. 2011) (summary order) ("[A] declaratory judgment proceeding that 'set[s] the table for a determination under title 11' for the operation of the Bankruptcy Court's core functions, such as allowance or disallowance of claims or the administration of the estate, is a core proceeding.") (quoting *In re PSINet, Inc. v. Cisco Sys. Cap. Corp.*, 271 B.R. 1, 12 (Bankr. S.D.N.Y. 2001)); *accord Best Prods. Co.*, 68 F.3d at 31 (application of prepetition intercreditor agreement was "essential to the administration of the estate") (citing 28 U.S.C. § 157(b)(2)(A)).

The present dispute is therefore particular to and "uniquely affected by" this bankruptcy. *U.S. Lines, Inc.*, 197 F.3d at 637; *S.G. Phillips Constructors, Inc.*, 45 F.3d at 706.  It also appears likely to "directly affect a core bankruptcy function"—whether to confirm a proposed plan of reorganization.  *U.S. Lines, Inc.*, 197 F.3d at 637; *Best Prods. Co.*, 68 F.3d at 31.  The determination in *U.S. Lines* therefore applies here:  "Notwithstanding that the . . . claims are upon pre-petition contracts, we conclude that the impact these contracts have on other core bankruptcy functions nevertheless render the proceedings core."  197 F.3d at 638; *accord Straton*, 283 U.S. at 321; 28 U.S.C. § 157(b)(2)(A).

Delaware Trust's depiction of this dispute as a routine contract action involving a pre-bankruptcy contract is, therefore, misleading.  It presents this action outside of its legal and

23

factual context, which are essential to determining whether the claim at issue is "independent" of the bankruptcy proceedings.  *U.S. Lines, Inc.*, 197 F.3d at 637.  For the reasons reviewed above, the context here reveals that the resolution of this dispute arises from and is bound up with the broader bankruptcy and plan confirmation process.

*Fourth*, it appears that the court that resolves the allocation dispute may be called upon to consider the interaction between provisions of the Intercreditor Agreement and bankruptcy law and principles.  Two examples illustrate the point.  First:  As noted, Delaware Trust seeks a declaration that monthly adequate protection payments should be allocated based on the accrual of *post*petition interest.  However, under the Bankruptcy Code, interest is no longer to accrue on the First Lien obligations unless they are oversecured or the Debtors are solvent.  *See* 11 U.S.C. § 506(b); *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 372–73 (1988) ("Since this provision [§ 506(b)] permits post-petition interest to be paid only out of the 'security cushion,' the undersecured creditor, who has no such cushion, falls within the general rule disallowing postpetition interest."); *In re Vest Assocs.*, 217 B.R. 696, 701 (Bankr. S.D.N.Y. 1998) ("While the general rule in bankruptcy is that 'interest on debtors' obligations ceases to accrue at the beginning of the proceedings,' postpetition interest continues to accrue on oversecured claims until payment of the claims or until the effective date of a confirmed plan.") (quoting *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 163 (1946); citing *Rake v. Wade*, 508 U.S. 464, 466 (1993)).  Resolving the allocation dispute thus may require a court to consider substantive bankruptcy law and its interplay with the Intercreditor Agreement. A second example:  Delaware Trust bases its contractual argument on § 4.1 of the Intercreditor Agreement, which, in pertinent part, provides that "Collateral or any proceeds thereof" shall be distributed in accordance with a specified waterfall that may track postpetition interest rates.  But

this construction is contested.  Based on the parties' briefs, this issue may turn in part on the nature of the adequate protection payments required by the Bankruptcy Court's Cash Collateral Order, in particular whether they qualify, under the Intercreditor Agreement, as "Collateral or any proceeds thereof."  Insofar as such payments are creatures of the Bankruptcy Code, there may therefore be a need to delve into bankruptcy law in considering this question.

To be sure, the merits of the dispute over allocation methodology have not been briefed to this Court.  The Court does not intend for the above commentary to limit or focus the analysis ultimately used to resolve this dispute.  But the Court has been given enough of a preview to suggest that applying and construing bankruptcy law may well prove relevant to its resolution.  And any need to consider such law would be a byproduct of the pending bankruptcy proceeding.  Otherwise, these issues would not arise.  The likely relevance of bankruptcy law supports a finding of "arising in" jurisdiction.  *See U.S. Lines, Inc.*, 197 F.3d at 637.[3]

The Court therefore holds that "arising in" jurisdiction exists.

In light of this holding that the claims here are core bankruptcy claims, Delaware Trust's claim of mandatory abstention is moot.  *See* 28 U.S.C. § 1334(c)(2).

---

[3] The cases on which Delaware Trust relies are inapposite.  In several, courts prohibited debtors from linking prepetition contract claims to the bankruptcy proceedings where the debtors had not shown a nexus to those proceedings.  *See, e.g.*, *Orion Pictures Corp.*, 4 F.3d at 1102; *In re Enron Power Mktg., Inc.*, No. 01 Civ. 7964 (HB), 2003 WL 68036, at *8–9 (S.D.N.Y. Jan 8, 2003).  In another, the dispute did not involve parties to the bankruptcy proceedings, and the outcome would only indirectly affect the debtor's available insurance proceeds.  *See Mt. McKinley*, 399 F.3d at 448–49.  In still another, a dispute regarding the allocation of sale proceeds "would not [a]ffect the estate" because the dispute occurred *after* the bankruptcy court approved a sale of substantially all of the debtor's assets.  *See In re Best Mfg. Grp. LLC*, No. 06 Bk. 17415 (DHS), 2007 WL 2746834, at *2, *5–6, (Bankr. D.N.J. Sept. 17, 2007).  And, finally, *Extended Stay* supports a finding of core bankruptcy jurisdiction here.  That action involved three separate adversary proceedings.  In one, a creditor group sued another over pre-bankruptcy negotiations regarding a potential reorganization plan.  The court retained jurisdiction, holding it "overwhelmingly" core due to "the potential impact of the relief sought on [the debtor's] efforts to reorganize" and potential plan confirmation.  435 B.R. at 139.

The Court has, however, considered Delaware Trust's alternative application that the Court exercise permissive abstention.  After considering the relevant factors, the Court concludes, emphatically, that abstention is inappropriate.  As explained further below in the discussion of Wilmington Trust's transfer motion, the interests of efficiency and economy strongly favor a comprehensive "one-stop shop" resolution of the bankruptcy proceeding, and disfavor atomizing that proceeding by dispatching the claims here to a court other than the Bankruptcy Court.[4]  Moreover, for the reasons noted earlier, the present dispute grows out of and is intertwined with the bankruptcy proceeding.  And there is no concern about the Bankruptcy Court's inability to oversee a jury trial, because Delaware Trust has not demanded a jury trial, and indeed waived its right to a jury trial in § 9.7 of the Intercreditor Agreement.  *See* Rosenberg Decl., Ex. A.

There is, therefore, "every reason practically and substantively to handle this case as part of the [TCEH] bankruptcy," and "comity will not be offended by declining abstention."  *Lothian Cassidy*, 487 B.R. at 165 (quoting *Lothian Cassidy LLC v. Ransom*, 428 B.R. 555, 560 (E.D.N.Y. 2010)).

---

[4] *See Celotex Corp.*, 514 U.S. at 308 (in enacting § 1334(b), "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate") (citations omitted). Further, the contract-law issues raised by the Intercreditor Agreement do not appear to implicate complex questions of New York State law, such that there would be a "material difference in the ability of the state and federal courts to decide these issues."  *CAMOFI Master LDC v. U.S. Coal Corp.*, 527 B.R. 138, 145 (Bankr. S.D.N.Y. 2015); *accord Winstar Holdings, LLC v. Blackstone Grp. L.P.*, No. 07 Civ. 4634 (GEL), 2007 WL 4323003, at *5 (S.D.N.Y. Dec. 10, 2007) ("There is little basis to invoke comity to the state courts here, and every reason to invoke the federal jurisdiction.  Although plaintiffs' claims are based on state law, the state law claims are straightforward common-law claims that do not involve arcane or idiosyncratic provisions of New York law."); *In re Adelphia Commc'ns Corp.*, 285 B.R. 127, 146 (Bankr. S.D.N.Y. 2002) (contrasting issues of contract law, which federal courts routinely address, with "matters involving family law, probate law, condemnation law, or other specialized areas of the law not regularly addressed in the federal courts").

### B.    The Motion to Transfer

#### 1.    Applicable Legal Standards

Transfer of venue with respect to "core" proceedings is governed by 28 U.S.C. § 1412, which provides:  "A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties."  *See also McHale v. Citibank, N.A.*, No. 09 Civ. 6064 (SAS), 2009 WL 2599749, at *5 (S.D.N.Y. Aug. 24, 2009).  In determining whether to transfer under 28 U.S.C. § 1412, courts consider the same factors as under the general transfer provision, 28 U.S.C. § 1404(a).  *Lothian Cassidy*, 487 B.R. at 165.  The goals of § 1404 are to prevent waste of time, energy, and money, and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense.  *See Ritchie Capital Mgmt., L.L.C. v. U.S. Bank Nat'l Ass'n*, No. 14 Civ. 8513 (PAE), 2015 WL 1611391, at *3 (S.D.N.Y. Apr. 10, 2015); *Ritchie Capital Mgmt., L.L.C. v. BMO Harris Bank, N.A.*, No. 14 Civ. 1936 (ER), 2015 WL 1433320, at *7 (S.D.N.Y. Mar. 30, 2015).

In deciding motions to transfer venue under § 1404(a), courts inquire, first, "whether the action could have been brought in the transferee district and, if yes, whether transfer would be an appropriate exercise of the Court's discretion," taking into account a variety of factors, including, *inter alia*, convenience to affected parties and efficiency.  *U.S. Nat'l Bank*, 2015 WL 1611391, at *3 (citation omitted).[5]

---

[5] Assessing whether transfer is a valid exercise of discretion requires the Court to balance various factors: (1) the convenience of the witnesses; (2) the convenience of the parties; (3) the location of relevant documents and the relative ease of access to sources of proof; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded the plaintiff's choice of forum; and (9) efficiency and the interests of justice.  *Keitt v. New York*, No. 12 Civ. 2350 (PAE), 2013 WL 3479526, at *2–3 (S.D.N.Y. July 10, 2013).

27

### 2.      Application

The answer to the first question under § 1404(a) is yes:  This action could have been brought in the District of Delaware.  Delaware is where the bankruptcy proceedings are pending.  *See* 28 U.S.C. § 1409(a) ("[A] proceeding arising under title 11 or arising in or related to a case under title 11 may be commenced in the district court in which such case is pending.").  And in the Cash Collateral Order, the Bankruptcy Court retained non-exclusive jurisdiction, stating:  "The Holdback Amount shall be held in the Escrow Account pending further order of this Court (or another court of competent jurisdiction) approving an allocation of the Holdback Amount among the Prepetition First Lien Creditors."  Rosenberg Decl., Ex. B at 33.  Moreover, even apart from the nexus to the bankruptcy proceedings, this case could have been initiated in Delaware because Delaware Trust is a Delaware entity with its main corporate headquarters in Delaware, and Wilmington Trust also has its main office in Delaware.  Compl. ¶¶ 9–10; *see also Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010) (finding corporation to be citizen of state where it has its principal place of business, referring to the "place where the corporation's officers direct, control, and coordinate the corporation's activities").  Accordingly, venue would be proper in the District of Delaware.

As to the second question under § 1404(a), involving whether transfer would be a proper exercise of discretion, the interests of justice are furthered when a case is transferred to a venue that would promote judicial economy.  *See, e.g.*, *JPMorgan Chase Bank, N.A. v. Coleman-Toll Ltd. P'ship*, No. 08 Civ. 10571 (RJS), 2009 WL 1457158, at *8 (S.D.N.Y. May 26, 2009).  The "existence of a related action pending in the transferee court weighs heavily towards transfer."  *Id.* (citation omitted); *accord CCM Pathfinder Pompano Bay, LLC v. Compass Fin. Partners LLC*, 396 B.R. 602, 608 (S.D.N.Y. 2008); *Nat'l Union Fire Ins. Co. v. Turtur*, 743 F. Supp. 260,

263 (S.D.N.Y. 1990).  A transfer is particularly appropriate when the related lawsuit "involv[es] the same facts, transactions, or occurrences."  *Coleman-Toll Ltd. P'ship*, 2009 WL 1457158, at *8 (quoting *Nieves v. Am. Airlines*, 700 F. Supp. 769, 773 (S.D.N.Y. 1988)).  The reason is clear: Litigating related actions in the same tribunal fosters efficient case administration, avoids needless expense, and avoids the risk of conflicting rulings.  *See, e.g.*, *Wyndham Assocs. v. Bintliff*, 398 F.2d. 614, 619 (2d Cir. 1968); *Ritchie Capital Mgmt., L.L.C. v. JPMorgan Chase & Co.*, No. 14 Civ. 2557 (LGS), 2014 WL 5810629, at *9 (S.D.N.Y. Nov. 10, 2014).

These considerations strongly favor transferring this matter to the District of Delaware, within which it will be referred to the Bankruptcy Court under the standing order of reference in that District.  *See* Amended Standing Order of Reference (D. Del. Feb. 29, 2012).  As noted, this action is closely related to the ongoing bankruptcy proceedings.  It can be promptly adjudicated there by a judge who is intimately familiar with the facts, issues, and entities of the bankruptcy generally, and, indeed, with the facts of this dispute specifically.  And Judge Sontchi has set aside a substantial period of time late this fall to consider the Debtors' proposed reorganization plan, and it is reasonable to expect that he will take up this matter before or during those proceedings.  There is, further, a "strong bankruptcy code policy" in favor of centralized litigation in the district where a related bankruptcy case is pending.  *Cuyahoga Equip. Corp.*, 980 F.2d at 117.  Where, as here, the action is a core proceeding, "the district in which the underlying bankruptcy case is pending is presumed to be the appropriate district for hearing and determination of a proceeding in bankruptcy."  *In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1391 (2d Cir. 1990).  And because resolution of this dispute could affect the rights and prioritization among creditors, "[t]he interests of justice overwhelmingly dictate transfer" to the

court overseeing the bankruptcy proceedings.  *M.D. Sass Re/Enter. Partners v. Cargill Fin.*

*Servs. Corp.*, No. 93 Civ. 7414 (TPG), 1994 WL 97335, at *2 (S.D.N.Y. Mar. 18, 1994).

A transfer is also convenient for the parties.  It gives them a single court to resolve their

various disputes.  Further, of the key parties to this particular dispute, plaintiff Delaware Trust

and defendant Wilmington Trust are Delaware citizens; the Debtors are present and actively

litigating in Delaware; and the intervenors have indicated their support for transfer, *see* Dkt. 55,

59, and regularly participate in the bankruptcy proceedings.

Here, perhaps the only factor meaningfully weighing against transfer is the plaintiff's

choice of forum.  *See U.S. Nat'l Bank*, 2015 WL 1611391, at *7; *Keitt*, 2013 WL 3479526, at *3.

That choice is "presumptively entitled to substantial deference," *Gross v. British Broad. Corp.*,

386 F.3d 224, 230 (2d Cir. 2004), although less so "where the connection between the case and

the chosen forum is minimal," *U.S. Nat'l Bank*, 2015 WL 1611391, at *7 (quoting *Keitt*, 2013

WL 3479526, at *3).  Here, there is a genuine connection to a New York forum, as the

Intercreditor Agreement contains a non-exclusive forum selection clause under which the parties

consented to jurisdiction and venue in the New York courts.  This factor therefore does weigh

against transfer.  It does not, however, invariably carry the day, as actions have frequently been

transferred to jurisdictions where bankruptcy proceedings have been pending notwithstanding

permissive forum selection clauses.  *See, e.g.*, *Foothill Capital Corp. v. Kidan*, No. 03 Civ. 3976

(RMB), 2004 WL 434412, at *4–5 (S.D.N.Y. Mar. 8, 2004) (action transferred to district where

bankruptcy was pending notwithstanding permissive forum selection clause); *Industri &*

*Skipsbanken A/S v. Levy*, 183 B.R. 58, 64 (S.D.N.Y. 1995) (same).

Having carefully considered the § 1404(a) factors in totality, the Court has determined

that they compellingly support transfer to the District of Delaware, in the expectation that this

matter will then be referred to the Delaware Bankruptcy Court.  The Court is particularly

convinced by the relative efficiency and convenience of siting this case in the court that is

familiar with the general and specific disputes, and is currently overseeing a swiftly proceeding

bankruptcy with which the present dispute is intertwined.  *See Cuyahoga Equip. Corp.*, 980 F.2d

at 117 (retaining bankruptcy court jurisdiction based in part on "strong bankruptcy code policy"

favoring "centralized and efficient administration" in bankruptcy court).

## CONCLUSION

For the foregoing reasons, the Court (1) grants the intervenors' motions to intervene,

(2) denies Delaware Trust's motion to remand the case to state court, and (3) grants Wilmington

Trust's and the intervenors' motions to transfer the case to the District of Delaware, from which

it will be referred to the Delaware Bankruptcy Court.

The Clerk of Court is respectfully directed to terminate the motions pending at docket

numbers 31, 39, 43, 55, and 61, and to close this case.


SO ORDERED.

Paul A. Engelmayer
PAUL A. ENGELMAYER
United States District Judge

Dated: July 23, 2015
        New York, New York